UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RENATE D'ANGELO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23 CV 3714 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| STERIGENICS U.S., LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## Memorandum Opinion and Order

Plaintiff Renate D'Angelo alleges that her chronic lymphocytic leukemia was caused by her inhalation of ethylene oxide ("EtO") from a Sterigenics U.S., LLC ("Sterigenics") facility in Willowbrook, Illinois that sterilizes medical equipment. Although complete diversity does not exist between D'Angelo and all Defendants, Sterigenics removed this case to federal court anyway, alleging that D'Angelo fraudulently joined the nondiverse Defendant GTCR, LLC ("GTCR"). D'Angelo also alleges that the Illinois citizenship of Defendants GTCR, Griffith Foods International, Inc. ("Griffith"), Bob Novak, Daniel Gibala, and Roger Clark does not preclude removal under the forum defendant rule because those Defendants had not yet been served at the time of removal. D'Angelo moves to remand her case back to state court. For the reasons below, the Court grants D'Angelo's motion to remand (ECF No. 18).

## Background

The Court takes the following facts from D'Angelo's Complaint and evidence submitted by the parties.[1]

---

[1] On a motion to remand, "the Court is not limited by the allegations of the parties' pleadings but may 'pierce the pleadings' and consider 'summary judgment-type evidence such as affidavits and deposition testimony' in determining whether fraudulent joinder has occurred." *Veugeler v. Gen. Motors Corp.*, No. 96 C 7278, 1997 WL

This case concerns medical equipment sterilization facilities located in Willowbrook, Illinois (the "Willowbrook facility"). The Willowbrook facility began using EtO as a sterilant in 1984, resulting in EtO emissions into the Willowbrook community—a densely populated residential area. Although EtO has been a known carcinogen since the 1940s, the Willowbrook facility did not use best practices and control technologies available to reduce their EtO emissions, which allegedly resulted in a disproportionate risk of cancer in the Willowbrook area. In February 2019, the Illinois Environmental Protection Agency ("EPA") ordered the Willowbrook facility to stop using EtO, and in September 2019, Sterigenics, the facility's operator, announced the permanent closure of the Willowbrook facility.[2]

Plaintiff D'Angelo lived, worked, and recreated near the Willowbrook facility and unknowingly breathed the EtO emissions on a continuous basis for years. She alleges that Defendants' negligence and wrongful conduct caused the EtO emissions from the Willowbrook facility, which in turn caused her chronic lymphocytic leukemia and other injuries.

Defendant GTCR is part of a private equity firm that provides advice and services to investment funds. In 2011, three investment funds collectively known as "Fund IX"—which D'Angelo alleges was created, maintained, and managed by GTCR—acquired a controlling ownership interest in STHI Holdings, LLC ("STHI"), the parent company of Sterigenics International, LLC (now Sotera), along with its subsidiaries (including Sterigenics) and parent companies, for $675 million. In 2015, Fund IX sold its majority interest in Sotera's holding company to a group of investment funds associated with the private equity firm Warburg Pincus,

---

160749, at *2 (N.D. Ill. Apr. 2, 1997) (internal punctuation omitted) (listing cases). More specifically, "[a] limited use of affidavits and other evidence is permissible so long as the evidence is not used to 'pre-try' the case." *Id.* (citation omitted); *see also Faucett v. Ingersoll-Rand Mining & Mach. Co.*, 960 F.2d 653, 655 (7th Cir. 1992) (finding affidavit sufficient to establish fraudulent joinder). "The Court must, however, give the benefit of factual and legal inferences to the plaintiff." *Veugeler*, 1997 WL 160749, at *2.

[2] Defendant Sotera Health Services, LLC (previously named Sterigenics International, Inc. and Sterigenics International, LLC, together referred to herein as "Sotera") is the sole owner, member, and manager of Sterigenics.

LLC. At the same time, three investment funds collectively known as "Fund XI" (together with Fund IX, the "Funds") made an investment to acquire a non-controlling, minority ownership interest in STHI, the then-holding company for Sotera. After the 2015 investment, Fund XI did not have a majority interest in any entity in the Sterigenics corporate family, and Fund IX had no interest whatsoever. Fund IX subsequently wound up its operations and dissolved. GTCR is a separate legal entity from the funds it advises, as well as from the general and limited partners of such funds and the portfolio companies in which the funds ultimately invest.

D'Angelo nonetheless alleges that GTCR performed operations for the Funds, managed the Funds, and, by extension, managed critical aspects of the Funds' investments, including Sterigenics. D'Angelo alleges that GTCR and its executives, including Sean Cunningham, Constantine Mihas, and David Donnini, among others, performed actual management tasks for Sterigenics that transcended their concurrent investment advisory functions for the Funds. In all functional respects, GTCR, individually and by virtue of its control of various shell entities and holding companies it referred to as "vehicles," allegedly operated as the functional nerve center that controlled both the "vehicles" and acquired companies, such as Sterigenics, via its direct management of both. In sworn testimony, former GTCR principal Bruce Rauner confirmed the business purpose of GTCR extended beyond passive investment advice and into the direct management of GTCR "vehicles" and/or "funds" that were responsible for day-to-day decision-making within Sterigenics.

In late 2010 and early 2011, GTCR conducted an extensive due diligence effort toward the Sterigenics investment opportunity and advised Fund IX with respect to its decision in 2011 to invest in Sotera. GTCR learned that EtO emitted from Sterigenics's Willowbrook facility elevated the cancer risk of community residents. It further learned that Sterigenics used EtO to

sterilize medical equipment at the Willowbrook facility and had been emitting EtO into the Willowbrook community since 1984. GTCR's due diligence investigation as to Sterigenics's compliance with EtO regulations revealed that Sterigenics had "historically lagged regulatory changes" and the Willowbrook facility had been, and could in the future become, subject to enforcement actions such as compliance orders and being shut down due to problems with emissions-related regulatory compliance. Further, GTCR learned through its due diligence that Sterigenics was under two criminal investigations relating to EtO emissions from its sterilization facility in Zoetermeer, Holland and that Sterigenics had shut down the Zoetermeer facility. GTCR further noted that, in 2010, 2,000 Zoetermeer residents and facility employees were told they had been exposed to Sterigenics's EtO, that this had put them at risk of developing cancer, and that Sterigenics had been warned that third-party liability claims may result.

GTCR learned both as part of its due diligence investigation of Sterigenics's business and in the course of providing management services to Sterigenics about Sterigenics's use of EtO in its sterilization process, Sterigenics's permitting history, the levels of its emissions of EtO, methodologies to capture EtO emissions, and the cancer risks Sterigenics's EtO emissions posed to the neighboring community. GTCR also learned that the use of emissions control equipment required to reduce emissions of EtO was expensive and required substantial capital to operate.

D'Angelo alleges that GTCR's operating strategy for Sterigenics was based on its ability to increase EtO sterilization capacity to rapidly boost short-term profits. GTCR's pitch books for the Funds indicated its "Leaders Strategy:" "As in previous GTCR funds, [the Fund's] investment strategy is to team with strong executive teams to build companies in fragmented industries. These 'management startups' – where GTCR will first team up with a management group and then purchase a platform on which to build the company – are expected to make up

approximately 60% of the deals in [the Fund]." Consistent with its Leaders Strategy, GTCR allegedly viewed its involvement with Sterigenics as a partnership with the new Sterigenics CEO and executive team to grow the Sterigenics business and profits through active management of Sterigenics business strategy, including decisions as to whether and to what extent Sterigenics should invest its resources to reduce EtO emissions to safe levels.

During the 2010 to early 2011 pre-acquisition time period, GTCR determined that Sterigenics's operational strategy would be to grow short-term profits as quickly as possible so Sterigenics could be profitably resold within five years. One strategy set out in GTCR's own documents was expansion of Sterigenics's sterilization capacity and operations through "the addition of new E[t]O chambers in existing facilities" which "provides a particularly attractive return on capital." Another GTCR strategy for quick profit-growth involved a variety of "[c]ost savings projects" such as reducing "labor costs" and the acquisitions of additional companies so that those companies' profits could be consolidated with Sterigenics's, making Sterigenics appear more profitable. After Sterigenics was acquired in March 2011, GTCR began to implement its operational strategy of quick profit-growth.

To help enforce its 5-year exit strategy, GTCR installed its own managing directors and employees—Sean Cunningham, Constantine Mihas, David Donnini and Benjamin Daverman— as directors of the boards of Sotera and its parent company. These GTCR representatives made up the majority of, and thus controlled, the boards between 2011 and 2015. D'Angelo further alleges that GTCR selected Michael Mulhern—previously selected by GTCR as CEO of four GTCR-controlled portfolio companies—to be Sotera's top executive and added "[t]hree-time

GTCR CFO Phil Macnabb . . . to [the] management team" at Sterigenics, trusting Macnabb to execute GTCR's operational strategy at Sterigenics.[3]

Although Cunningham swears in an affidavit submitted by Sterigenics that "[i]n our capacity as directors of [Sotera], Benjamin Daverman, David Donnini, Constantine Mihas, and I have provided advice and guidance typical of board membership," (ECF No. 32-1), D'Angelo alleges that GTCR nonetheless managed and directed Sterigenics's operating strategy through its control of the Sterigenics board and management. She alleges that Cunningham admitted that GTCR's role at Sterigenics was far more than a mere "investment adviser," but rather was that of a "partner[]" with Sterigenics, directly working on "operational" improvement and profit growth. As Cunningham explained, GTCR's operational strategy at Sterigenics "transform[d] the business" as follows:

> [c]onsistent with GTCR's differentiated approach to private equity investing [*e.g.*, its "executing The Leaders Strategy™"], and in light of GTCR's track record of successful investments in the healthcare industry, GTCR partnered with two exceptional leaders and previous GTCR portfolio company executives, Michael Mulhern and Phil Macnabb, in March 2011 to acquire Sterigenics International LLC. . . . After acquiring Sterigenics, GTCR partnered with Mr. Mulhern and Mr. Macnabb to pursue a wide range of operational initiatives to improve the business and organically grow EBITDA over GTCR's four year investment.

As promised, within five years of the Sterigenics acquisition, GTCR had "partnered" with Sterigenics's management to increase the Willowbrook facility's EtO sterilization capacity, and therefore EtO emission capacity, by adding a new EtO sterilization chamber which would accommodate new sterilization volume and generate a return on investment of approximately $1.4 million in revenue. GTCR secured the Sotera board's approval to add that chamber, all while knowing that the Willowbrook facility did not have its back vents connected to emissions

---

[3] Cunningham swears that, "No members of the Sotera Health management team have ever been employed by GTCR LLC, Fund IX, Fund XI, or any other GTCR-affiliated fund." (ECF No. 32-1.)

controls, unlike other Sterigenics facilities, and so all such emissions blew directly into the Willowbrook community. D'Angelo alleges that GTCR knew from its due diligence, monitoring, and oversight of Sterigenics's profits and operating costs, that increased emission capacity brought with it an increased risk of harm to members of the surrounding community, including D'Angelo. Although existing emissions control technology would have reduced the Willowbrook facility's back vent emissions by 90%, the GTCR investment strategy of reducing capital expenditures meant that no money was made available for significant reduction of back vent emissions until 2018, and only then because the U.S. and Illinois EPA began to inquire as to why more was not being done to reduce the Willowbrook facility's emissions. Between 2011 and 2015, Sterigenics consistently outperformed GTCR's profit-growth forecasts because of this chamber installation and other of GTCR's operational directives at Sterigenics, including, "higher volumes" and "growth" of sterilization services driven in part by GTCR's "Investment Management Strategy" to, *inter alia*, "[t]arget and further penetrate medical device manufacturers that currently 'in-source' sterilization services."

Within five years of the Sterigenics acquisition, in May 2015, GTCR facilitated the planned exit from Sterigenics at a profit when it caused Fund IX to sell Sterigenics to another GTCR Fund that it managed (Fund XI), as well as the private equity firm Warburg Pincus, for $2.2 billion. Cunningham described GTCR's role in this successful investment outcome: "In four years, with GTCR's financial and strategic backing, the Company [Sterigenics] significantly increased revenues and EBITDA, driven by a broad range of operational initiatives and three highly strategic acquisition[s]." He also stated that "GTCR, whose deal team was led by Managing Directors Dean Mihas, Sean Cunningham, and Dave Donnini, and Sterigenics took

7

enormous pride in building a growing and profitable Illinois-based company, as well as creating the only vertically integrated sterilization provider in the world."

GTCR's services to Fund XI and Sterigenics were allegedly substantially the same as those provided to Fund IX. As GTCR had done before, it allegedly chose to manage the performance of Sterigenics by renewing its operational strategy at Sterigenics, *i.e.*, rapidly growing the company's short-term profits so that it could be profitably resold in five years. Between 2015 and 2020 Cunningham, Mihas, and Donnini continued to serve on Sotera's board. GTCR also continued to use its Leaders Strategy to partner with Sterigenics management to implement its 5-year exit strategy. For example, GTCR allegedly: recruited and installed Michael Petras as CEO and board member of Sotera in June 2016 because it "had high expectations he'll help us create incremental value"; maintained Mulhern's leadership of Sterigenics when he retired as CEO of Sotera in 2016 by ensuring that he continued to serve on the Sotera board; and retained Macnabb as Sotera's Sterilization Services President until December 2020.

Mark Metzger, the General Manager of the Willowbrook facility, described that the Willowbrook facility's emissions controls were not operating properly because they were not being properly maintained as a result of lack of personnel, lack of training, and lack of knowledge within the Maintenance Department. He stated that the reason for that was a lack of funding and that the "folks making the decisions in terms of where the money was going were from GTCR and Warburg Pincus." Sterigenics's employees posted online comments to raise concerns about the safety of its operations under GTCR's management and budgetary and operational control. For example, one employee on June 25, 2013, wrote, "Since new management was installed by the investment company that owns them, doubling customer prices and massive cost cutting are paramount. There is minimum attention to quality & safety which

will backfire eventually. Only profitability counts to boost the company's value. Btw, new CEO was installed some time ago." Another employee wrote, "No education is given. No chance to expand kno[w]ledge. Owned by capital investment f[u]nd meaning that Sterigenics can [m]ake no independent decisions."

D'Angelo alleges that the degree of control GTCR exercised over Sterigenics surpassed its role as a self-proclaimed "investment advisor" and, by design, functioned as a shadow management team for Sterigenics that dictated the business goals for Sterigenics, including but not limited to decisions to increase EtO emissions into the Willowbrook community, to forego investment in technology to reduce emissions, and to conceal the risks posed by EtO emissions. GTCR allegedly knew or should have reasonably foreseen that the budget cuts and investment in projects that only drove incremental earnings would stop Sterigenics from spending on safety, maintenance and training and prevent Sterigenics's use, addition and/or maintenance of EtO emission control equipment, and cause continued injury to Plaintiffs and others exposed to the facility's toxic emissions of EtO.

D'Angelo filed her complaint against Sterigenics, GTCR, and the other Defendants in the Circuit Court of Cook County. Based in part on the above allegations, D'Angelo asserts four counts against GTCR (among others) for negligence, willful and wanton conduct, civil battery, and public nuisance. Sterigenics removed the case to federal court based on diversity jurisdiction. Although both D'Angelo and GTCR are citizens of Florida—and therefore complete diversity does not exist—Sterigenics argues that removal is proper because D'Angelo fraudulently joined GTCR to destroy complete diversity, and therefore the Court should not consider its citizenship for jurisdictional purposes. Sterigenics also argues that no consent was needed from the other Defendants for removal, and that the Illinois citizenship of Defendants

GTCR, Griffith, Novak, Gibala, and Clark does not preclude removal under the forum defendant rule, because none of those Defendants had been served in the state court action at the time of removal. D'Angelo filed a motion to remand this case to state court.

## Legal Standard

Section 1447(c) requires a court to remand a case "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). For a case to be within a federal court's diversity jurisdiction, diversity of citizenship must be complete—meaning that no plaintiff may be a citizen of the same state as any defendant. *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) (quoting *Hoosier Energy Rural Elec. Coop. v. Amoco Tax Leasing IV Corp.*, 34 F.3d 1310, 1314–15 (7th Cir. 1994)). "The party seeking removal has the burden of establishing federal jurisdiction, and federal courts should interpret the removal statute narrowly, resolving any doubt in favor of the plaintiff's choice of forum in state court." *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009) (citation omitted); *see also Morris v. Nuzzo*, 718 F.3d 660, 670 (7th Cir. 2013). Though "[a] plaintiff typically may choose its own forum, [] it may not join a nondiverse defendant simply to destroy diversity jurisdiction." *Schur*, 577 F.3d at 763 (citations omitted). In other words, courts may disregard parties fraudulently joined. *Id.*; *see also Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 327 (7th Cir. 1993) ("In determining whether there is diversity of citizenship, parties fraudulently joined are disregarded").

To establish fraudulent joinder, a removing defendant must show that "after resolving all issues of fact and law in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant.'" *Morris*, 718 F.3d at 666 (emphasis in original) (quoting *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992)). When conducting this analysis, the court

10

considers whether the plaintiff has any reasonable possibility of success under state law, regardless of the plaintiff's motives. *Schur*, 577 F.3d at 764; *see also Poulos*, 959 F.2d at 73 ("[T]he federal court must engage in an act of prediction: is there any reasonable possibility that a state court would rule against the non-diverse defendant?").

In this case, the parties agree that Illinois law governs D'Angelo's claims.

## Discussion

As a threshold issue, D'Angelo points out that Sterigenics bears the burden of establishing this Court's jurisdiction over the case yet fails to allege the citizenship of GTCR in the notice of removal. Sterigenics responds in briefing that GTCR is a citizen of Florida and further argues that it was not required to state GTCR's citizenship in its notice of removal because it alleged that GTCR was fraudulently joined.

Sterigenics should have brought GTCR's citizenship to the Court's attention by including it in its notice of removal. *See* 28 U.S.C. § 1446(a) (requiring a notice of removal to "contain[] a short and plain statement of the grounds for removal"); *Wisconsin Knife Works v. Nat'l Metal Crafters,* 781 F.2d 1280, 1282 (7th Cir. 1986) ("The first thing a federal judge should do when a complaint is filed is check to see that federal jurisdiction is properly alleged"). This matters because, as it turns out, both D'Angelo and GTCR are citizens of Florida, and if the Court finds that GTCR is not fraudulently joined, then there is no basis for diversity jurisdiction and the Court lacks subject matter jurisdiction over the case. *See McCready*, 453 F.3d at 891. But Sterigenics did not include sufficient information in its notice of removal for the Court to conduct its jurisdictional analysis. The cases upon which Sterigenics relies for the proposition that it was not required to allege GTCR's citizenship in its notice of removal are distinguishable. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014) (holding "a

11

defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold"); *Midland Mgmt. Co. v. Am. Alt. Ins. Corp.*, 132 F. Supp. 3d 1014, 1017 (N.D. Ill. 2015) (notice of removal identified citizenship of nondiverse defendants that were allegedly fraudulently joined).

GTCR is a limited liability company ("LLC"), which is a citizen of every state in which any of its members is a citizen. *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007); *Ind. Gas Co., Inc. v. Home Ins. Co.*, 141 F.3d 314, 316 (7th Cir. 1998). To establish diversity jurisdiction, a party must *identify* the members so it is possible to verify the truth of the citizenship allegations. *See Montgomery v. Markel Int'l Ins. Co. Ltd.*, 259 F. Supp. 3d 857, 866–68 (N.D. Ill. 2017) (citing *Guar. Nat'l Title Co. v. J.E.G. Assocs.*, 101 F.3d 57, 58–59 (7th Cir. 1992) and *Am.'s Best Inns, Inc. v. Best Inns of Abilene, L.P.*, 980 F.2d 1072, 1073 (7th Cir. 1992)); *see also Meyerson v. Showboat Marina Casino P'ship*, 312 F.3d 318, 320–21 (7th Cir. 2002), *Johnson v. Nat'l Asset Advisors, LLC*, 772 F. App'x 328, 329 (7th Cir. 2019). Further, "if those members have members, the citizenship of those members [must be identified] as well[.]" *Thomas*, 487 F.3d at 534.

Sterigenics still does not identify GTCR's members and their citizenship in its briefing, relying instead upon GTCR's Rule 7.1 Disclosure Statement and Rule 3.2 Notification of Affiliates. (ECF No. 30.) That disclosure statement states that GTCR is an LLC whose sole member is GTCR Management Holdings LP. GTCR Management Holdings LP has one general partner, GTCR Capital LLC, and two limited partners, GTCR Feeder LP and BSCH Master I Sub (GAM-MGR) L.P. Both GTCR Capital LLC and GTCR Feeder LP have eight individual members, which are named in the disclosure statement. Seven of the eight individual members are citizens of Illinois, and one individual member is a citizen of Florida. The disclosure

statement fails to identify the member(s) and citizenship(s) of BSCH Master I Sub (GAM-MGR) L.P. Based on the disclosure statement, GTCR is a citizen of Illinois and Florida, as well as whichever state(s) BSCH Master I Sub (GAM-MGR) L.P. is a citizen of. Sterigenics, which bears the burden for establishing diversity jurisdiction, therefore continues to fail to fully identify the citizenship of GTCR. *Thomas*, 487 F.3d at 534.

However, because there is no dispute that GTCR is a citizen of Florida (and thereby presents a problem for complete diversity), and because Sterigenics at least raised the issue of fraudulent joinder in its notice of removal, the Court will consider the issue on the merits rather than remanding solely on the basis that Sterigenics fails to adequately allege GTCR's citizenship in its notice of removal. In the end, the result is the same.

Sterigenics argues that GTCR was fraudulently joined because D'Angelo has no real possibility of success on her "direct participation" theory of liability against GTCR. Specifically, Sterigenics contends that D'Angelo's claims against GTCR all rely on GTCR's indirect ownership interest in Sterigenics—the entity that operates the Willowbrook facility—as proof of liability, and that several layers of ownership separate GTCR from Sterigenics, so the "direct participation" theory of liability does not apply.

D'Angelo responds that the direct participation theory is not its only theory of liability against GTCR, and that the complaint asserts four separate counts against GTCR for negligence, willful and wanton conduct, civil battery, and public nuisance. D'Angelo does not specify which of the four counts it contends do not rely upon a direct participation theory of liability.

Although Sterigenics filed a surreply, it does not respond to D'Angelo's argument but rather assumes—without development—that all of D'Angelo's claims against GTCR must depend upon the direct participation theory. Sterigenics appears to infer that this is the only

possible path to liability that D'Angelo could pursue based on Sterigenics's allegation that none of D'Angelo's claims are supported by factual allegations about GTCR's own acts or omissions that allegedly caused D'Angelo's injuries. (Notice of Removal ¶ 20, ECF No. 1.) Sterigenics points out that a Cook County court in *Kamuda v. Sterigenics U.S., LLC*, No. 18 L 10475, granted a motion to dismiss a similar claim for civil battery against GTCR, although D'Angelo is quick to point out that that Order also denied a motion to dismiss a similar claim for public nuisance. (Aug. 17, 2020 Order, ECF No. 1-2.) Of course, that Order neither binds this Court nor applied the same legal standard at issue on a motion to remand.

Sterigenics has a heavy burden to show that, after resolving all issues of fact and law in favor of D'Angelo, there is no reasonable possibility she can succeed on a claim against GTCR. *Poulos*, 959 F.2d at 73; *Gottlieb*, 990 F.2d at 327. Sterigenics fails to carry that burden. Contrary to Sterigenics's framing of the complaint, D'Angelo alleges that GTCR itself operated aspects of the Willowbrook facility's sterilization operations and resulting EtO emissions. *Cf. United States v. Bestfoods*, 524 U.S. 51, 64–65 (1998) ("[D]erivative liability cases are to be distinguished from those in which 'the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management' and 'the parent is directly a participant in the wrong complained of[,]'" in which case "the parent is directly liable for its own actions." (citation omitted)). For example, the complaint alleges that GTCR decided to, and secured the Sotera board's approval to, add a new EtO sterilization chamber at the Willowbrook facility, thereby increasing sterilization volume and EtO emissions despite knowing that the back vents were not connected to emissions controls (unlike other Sterigenics facilities) and so the emissions blew directly into the Willowbrook community. The complaint also alleges the multiple times that Cunningham referred to GTCA's operational initiatives for Sterigenics and that one employee

14

indicated that GTCR installed management at Sterigenics's facilities. In other words, resolving all factual inferences in D'Angelo's favor, *Poulos*, 959 F.2d at 73, D'Angelo's allegations go beyond merely alleging that GTCR's role was limited to an indirect ownership interest in Sterigenics and permit the inference that GTCR operated sterilization operations at the Willowbrook facility alongside Sterigenics. *See Bestfoods*, 524 U.S. at 66 (finding the "ordinary or natural meaning" of "operate," in the "organizational sense," to be, "to conduct the affairs of; manage: *operate a business*" (emphasis original) (citing American Heritage Dictionary 1268 (3d ed. 1992)). At bottom, whether GTCR operated sterilization operations at the Willowbrook facility is a fact-intensive inquiry that raises issues of fact that are not properly resolved on a motion for remand.

Even assuming that D'Angelo's claims against GTCR all rely on a derivative theory of liability does not merit a different result. Sterigenics argues that direct participation liability applies only to parent companies and that GTCR is not Sterigenics's parent company. But the district court cases cited by Sterigenics do not directly address this issue; rather, they merely involve circumstances in which the direct participation liability theory was based on a parent-subsidiary relationship. *See Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *1 (N.D. Ill. May 22, 2012); *Grady v. Ocwen Loan Servicing, LLC*, No. 11-CV-1531, 2012 WL 929928, at *1 (N.D. Ill. Mar. 19, 2012).

D'Angelo argues that no case holds that the direct participant liability theory is limited to a parent-subsidiary scenario, and that the crux of that theory is where one corporation, regardless of its label, "specifically directs an activity where injury is foreseeable, or if it mandates an overall course of action and then authorizes the manner in which specific activities contributing to that course of action are undertaken, the corporation can be liable for foreseeable injuries."

*Nathan*, 2012 WL 1886440, at \*10; *see also Bestfoods*, 524 U.S. at 62 ("[T]here is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship *as well as generally*, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes. . . ." (emphasis added) (citations omitted)).

The complaint contains numerous allegations that GTCR controlled, managed, and/or directed Sterigenics's operations at the Willowbrook facility, including through the Funds. For example, even if a factfinder were to conclude that GTCR did not itself operate the Willowbrook facility when it decided to install a new EtO chamber, they may nonetheless conclude from that fact that GTCR specifically directed the manner in which Sterigenics operated the Willowbrook facility in order to increase sterilization volume, with the foreseeable effect of increasing EtO emissions. This and other facts may support a finding that GTCR controlled and directed Sterigenics's sterilization operations at the Willowbrook Facility: Cunningham admitted that GTCR's role at Sterigenics was far more than a mere "investment adviser," but rather was that of a "partner[]" with Sterigenics, directly working on "operational" improvement and profit growth; GTCR installed its own managing directors and employees as directors of the boards of Sotera and Sterigenics; Cunningham stated that "GTCR partnered with Mr. Mulhern and Mr. Macnabb to pursue a wide range of operational initiatives to improve the business"; GTCR's operational directives at Sterigenics included "higher volumes" and "growth" of sterilization services driven in part by GTCR's "Investment Management Strategy" to, *inter alia*, "[t]arget and further penetrate medical device manufacturers that currently 'in-source' sterilization services"; another GTCR strategy for quick profit-growth involved a variety of "[c]ost savings projects" such as reducing "labor costs" and the acquisitions of additional companies so that those companies'

16

profits could be consolidated with Sterigenics's, making Sterigenics appear more profitable; the General Manager of the Willowbrook facility stated that the sterilization operations and emissions at the Willowbrook facility were improperly maintained due to GTCR's decision not to fund EtO emissions control staffing, safety, maintenance, training, and equipment; one employee perceived that Sterigenics could make no independent decisions because of GTCR's involvement; and one employee indicated that GTCR installed management at Sterigenics's facilities.

These allegations together permit the inference that GTCR's level of control over Sterigenics's operations went beyond typical corporate "control," which "includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders." *Bestfoods*, 524 U.S. at 62. Resolving all issues of fact and law in favor of D'Angelo, the Court concludes that there is a reasonable possibility D'Angelo will succeed based on derivative liability against GTCR. *Poulos*, 959 F.2d at 73; *see also Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 237 (Ill. 2007) ("[B]udgetary mismanagement, accompanied by the parent's negligent direction or authorization of the manner in which the subsidiary accomplishes that budget, can lead to a valid cause of action under the direct participant theory of liability.").

In support of its fraudulent joinder argument, Sterigenics attaches evidence that GTCR was dismissed on summary judgment in one state court case, *Fornek v. Sterigenics U.S., LLC*, No. 2018-L-10744. That case was consolidated with hundreds of others pending in the Circuit Court of Cook County, all alleging harms stemming from EtO emissions from the Sterigenics facility in Willowbrook.

The Seventh Circuit has found that a federal district court considering fraudulent joinder is not bound by a state court's dismissal of a defendant or summary judgment ruling even where

that ruling was entered in the same case that had been removed to federal court. *Poulos*, 959 F.2d at 73 n.4 ("If a state trial court dismisses a defendant (or grants summary judgment, as did the Wisconsin court in the case before us), it does not resolve issues of *law* in either party's favor. Thus a federal court considering fraudulent joinder in a case where the state court has come to judgment is not bound by the state court's decision." (emphasis original)). A Circuit Court's Order from an unrelated case is even further removed and is not binding upon this Court.

Nor does this Court find the Circuit Court's Order particularly persuasive; it merely grants GTCR's motion for summary judgment "in accordance with the record on October 5, 2022." (ECF No. 1-4.) The parties attach the October 5, 2022 transcript, in which Judge Propes states by way of reasoning for her decision:

> [O]n the matter of the GTCR's Motion for Summary Judgment, I've read the papers, all of them that were submitted, both of the Motions for Summary Judgment that defense provided. I've read every word of what was provided by the plaintiff more than once. And I've read every case that's been cited except for the ones you came with just this morning. I've read every single case more than once and thought about it. And I really am of the opinion that—that, as a matter of law, the plaintiff has not stated a case against GTCR. The Motion for Summary Judgment will be— will be granted on the grounds that there's no issue of material fact that makes this—that allows this under the law to go forward.

(Oct. 5, 2022 Hearing Tr., 150:20–151:11, ECF No. 33-2.) Judge Propes makes clear that the grant of summary judgment dismissing GTCR only applied in the *Fornek* case. (*Id*. at 151:15–19.)

In an attempt to shed additional light on the Court's reasoning, Sterigenics submits GTCR's two motions for summary judgment that the Circuit Court considered. The briefing and argument on summary judgment encompassed both a case-specific argument regarding the *Fornek* plaintiff's failure to establish that her miscarriage was proximately caused by the emissions from the plant and an omnibus argument about GTCR's remoteness from any relevant conduct—the latter of which Sterigenics argues mirrors the same argument that it raises in its

18

opposition to remand. Sterigenics argues that because Judge Propes considered both motions, granted summary judgment "as a matter of law," and specifically referenced the name of the omnibus motion rather than the case-specific motion in her Order granting summary judgment, there is no "reasonable possibility" that D'Angelo will succeed in her claims against GTCR in this Court. This Court disagrees. Given the meager record in the *Fornek* case, as submitted to this Court, it is quite possible that Judge Propes granted summary judgment in GTCR's favor based on the *Fornek* plaintiff's failure to establish that her miscarriage was proximately caused by the emissions from the plant, not due to GTCR's alleged remoteness from the relevant conduct. Especially because the ambiguous *Fornek* record is construed in D'Angelo's favor at this stage, the Court is not persuaded that D'Angelo has no "reasonable possibility" of succeeding against GTCR based on a derivative theory of liability.

In sum, Sterigenics fails to show that D'Angelo has no reasonable possibility of success against GTCR and that GTCR was fraudulently joined. Because the Court finds that GTCR was not fraudulently joined it must consider GTCR's citizenship—Florida—in conducting its jurisdictional analysis. D'Angelo is also a citizen of Florida, and so the parties are not completely diverse and Sterigenics fails to establish diversity jurisdiction. This Court accordingly lacks subject matter jurisdiction over this case, which must be remanded to state court. 28 U.S.C. § 1447(c). The Court need not address the parties' arguments respecting the forum defendant rule.

### *Attorney's Fees and Costs*

D'Angelo argues that Sterigenics's failure to identify GTCR's citizenship in the notice of removal was objectively unreasonable and merits an award of costs. *See* 28 U.S.C. § 1447(c) ("An order remanding the case may require payment of just costs and any actual expenses,

including attorney fees, incurred as a result of the removal."). "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005). "Conversely, when an objectively reasonable basis exists, fees should be denied." *Id*. The Seventh Circuit puts a finer point on this standard: "[I]f, at the time the defendant filed his notice in federal court, clearly established law demonstrated that he had no basis for removal, then a district court should award a plaintiff his attorneys' fees. By contrast, if clearly established law did not foreclose a defendant's basis for removal, then a district court should not award attorneys' fees." *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007).

The Court finds that, based on the above discussion of fraudulent joinder, clearly established law did not foreclose Sterigenics's basis for removal. To be sure, Sterigenics should have identified GTCR's citizenship in the notice of removal even though it contended that GTCR was fraudulently joined. *See* 28 U.S.C.A. § 1446(a) (requiring a notice of removal to "contain[] a short and plain statement of the grounds for removal"). However, D'Angelo does not point to any binding authority holding that a removing defendant lacked an objectively reasonable basis for seeking removal by failing to identify the citizenship of a nondiverse defendant that it alleges in the notice of removal is fraudulently joined. The district court cases upon which D'Angelo relies did not involve situations where, as here, the removing defendant raised a good-faith argument of fraudulent joinder. *See DC Liquidators, LLC v. Warehouse Equip. Specialists, LLC*, No. 14 C 7222, 2015 WL 1502945, at *2 (N.D. Ill. Mar. 27, 2015) (awarding fees where untimely removal was plainly contrary to established law and finding that defendants' ultimate failure to establish complete diversity, while objectively unreasonable, was not a separate basis for awarding attorney's fees); *F.H. Paschen, SN Nielsen & Assoc v. Gillen*, No. 12 C 179, 2012

WL 130125, at *4 (N.D. Ill. Jan. 17, 2012) (no contention that defendant was fraudulently joined); *MTC Dev. Grp., LLC v. Lewis*, No. 11 C 7062, 2011 WL 5868236, at *5, *5 n.1 (N.D. Ill. Nov. 20, 2011) (finding defendants lacked an objectively reasonable basis to conclude there was complete diversity and noting that there was no indication that defendants, at the time of removal, considered the nondiverse defendant to be fraudulently joined).

Accordingly, because Sterigenics did not lack an objectively reasonable basis to seek removal, the Court declines to award costs and fees pursuant to 28 U.S.C. § 1447(c).

## Conclusion

For the reasons above, the Court grants D'Angelo's motion to remand [18] in large part and remands this case to the Circuit Court of Cook County, Illinois, pursuant to 28 U.S.C. § 1447. D'Angelo's motion [18] is denied in part only with respect to his request for attorney's fees and costs. Sterigenics's motion for leave to file surreply [34] is granted.

**SO ORDERED.**                                        **ENTERED: March 26, 2024**

**HON. JORGE ALONSO**
**United States District Judge**